272 F.3d 1207 (9th Cir. 2001)
 BENJAMIN K. ORIN, PLAINTIFF-APPELLANT
v.
RICHARD BARCLAY, AND HIS MARITAL COMMUNITY, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; ROBERT WALLACE, AND HIS MARITAL COMMUNITY, IN HIS INDIVIDUAL CAPACITY; ALAN HORNBERG, AND HIS MARITAL COMMUNITY, IN HIS INDIVIDUAL CAPACITY; RICK MCCLUSKEY, AND HIS MARITAL COMMUNITY, IN HIS INDIVIDUAL CAPACITY; CITY OF BREMERTON, A MUNICIPAL CORPORATION, DEFENDANTS-APPELLEES
 No. 00-35177
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted August 10, 2001
Filed November 9, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 A. Chad Allred, Ellis, Li & McKinstry, Seattle, Washington, Theresa Schrempp, Sonkin & Schrempp, PLLC, Mercer Island, Washington, for the plaintiff-appellant.
 Catherine Hendricks, Attorney General's Office, Tort Claims Division, Seattle, Washington; Steven T. Reich, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Seattle, Washington, for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington; Robert J. Bryan, District Judge, Presiding. D.C. No. CV-99-05125-RJB
 Before: Boochever, Tashima, and Tallman, Circuit Judges.
 Tallman, Circuit Judge:
 
 
 1
 Plaintiff Benjamin Orin was told by a community college official that he could protest abortion on campus only if he did not create a disturbance, interfere with students' access to school buildings, or couch his protest in overtly religious terms. After four factious hours of demonstration, campus security asked Orin to leave because he was violating these conditions. When he refused, campus security called City of Bremerton police officers who, after asking Orin to leave twice more, arrested him for criminal trespass and failure to disperse.
 
 
 2
 We must determine whether the conditions imposed on the protest violated Orin's clearly established First Amendment rights such that the school officials, the police officers, or the City of Bremerton may be liable to Orin for damages under 42 U.S.C. &#167 &#167 1983 and 1985(3). We must also determine whether the district court properly held that none of Orin's state tort law causes of action can survive summary judgment. We have jurisdiction, and affirm in part and reverse in part.
 
 I.
 
 3
 Orin is a member of Positively Pro-Life, an anti-abortion group that demonstrates at high schools, colleges, and medical clinics around the Northwest. On October 30, 1997, Orin and Jim McIntyre appeared unannounced in the office of Richard Barclay, Interim Dean of Students at Olympic Community College ("OCC").[1] They warned Barclay that they and a third Positively Pro-Life member intended to stage an anti-abortion protest on OCC's main quad. The protest was to include display of two large posters graphically depicting aborted fetuses in various states of dismemberment. They warned Barclay that the signs had elicited strong responses at prior protests, including physical violence.
 
 
 4
 Barclay informed the protestors that they must apply for and obtain a permit from OCC if they wished to hold an event on the quad. Orin responded, "We have a prior permit. The Bill of Rights says we can be here." Barclay told Orin that he could conduct the demonstration without a permit so long as he did not: (1) breach the peace or cause a disturbance; (2) interfere with campus activities or access to school buildings; or (3) engage in religious worship or instruction. The protestors then left for the main quad. Barclay dispatched two security guards to monitor the demonstration.
 
 
 5
 The Dean's Office began receiving student complaints about the protestors and their posters soon after the protest began. OCC accommodated the demonstration for approximately four hours. The size and temperament of the crowd attracted by the demonstration waxed and waned. At times there were only five or six students; at other times there were more than one hundred. On two occasions campus security had to interpose themselves between the crowd and the protestors to avert physical violence.
 
 
 6
 Shortly after 4:00 p.m., OCC security chief Robert "Rocky" Wallace asked the protestors to leave. When they refused, he called to request police assistance. He called again moments later to ask dispatch to expedite the response because the situation was "turning physical." The parties hotly dispute the events that precipitated Wallace's call to the police.
 
 
 7
 The demonstrators allege that Barclay appeared at the protest and informed them that if they "mentioned God or referred to th[e] Bible [he] would have[them] arrested and physically removed from campus." Orin allegedly responded that he would continue to decry abortion in religious terms and that Barclay would have to have him arrested. Barclay responded that he would do so, and the police arrived ten to fifteen minutes later. The demonstrators allege that they uttered no incendiary epithets and that they never felt threatened by the crowd.
 
 
 8
 By contrast, the security officers allege that the demonstration degenerated into an openly hostile incitement of an already angry crowd. Four students submitted declarations in support of the officers, indicating that they felt the demonstrators were "verbally assaulting students" and "attempting to pick a fight." They claim they heard the protestors call students "baby killers" and use incendiary racial and sexist epithets. In the security officers' estimation, physical conflict between the students and the demonstrators was inevitable. The security guards asked the demonstrators to leave because they "could no longer control the situation and the situation was turning physical."
 
 
 9
 Officer Alan Hornberg of the Bremerton Police Department was dispatched to OCC to respond to "a reported group of protesters that were refusing to leave and a large unruly crowd that was getting out of hand." Wallace met Hornberg at the edge of campus. As they walked to the quad, where the demonstration was being held, Wallace told Hornberg that the protestors had violated the conditions placed on them by Barclay, "the student crowd was agitated to the point of physical violence against the protesters," and "the security staff didn't feel that they had the manpower to protect the anti-abortion protesters from the students." He also informed Hornberg that McIntyre had hit one of the security officers, knocking his hat off his head.[2]
 
 
 10
 Upon arriving at the quad, Hornberg observed a crowd of forty to fifty students shouting angrily at the demonstrators. Hornberg approached the demonstrators and asked them to leave. Orin told Hornberg that campus officials only wanted him arrested because he was talking about religion. Orin then exclaimed that he was exercising his First Amendment right to free speech and "was not going anywhere." Hornberg again asked Orin to leave. When Orin again refused, Hornberg arrested him for criminal trespass and failure to disperse.
 
 
 11
 Bremerton Police Officer Rick McCluskey arrived after Orin's arrest. Hornberg reported that Orin was under arrest for trespassing and failing to disperse. McCluskey told Hornberg to take Orin to jail for booking.
 
 
 12
 Orin alleges that, upon reaching the jail, Hornberg questioned him without first reading him his Miranda rights. According to Orin, however, when he asked about his rights, Hornberg recited them to him. Orin also alleges a number of constitutional violations arising out of the conditions of his jail cell (it was cold, dirty, and uncomfortable), the ingredients used in the jail food (it was not vegetarian), and the conduct of jail personnel.
 
 
 13
 Orin sued Dean Barclay, security officer Wallace, police officers Hornberg and McCluskey, and the City of Bremerton, stating five causes of action: (1) violation of his First Amendment rights[3] compensable under 42 U.S.C. &#167 1983; (2) conspiracy to violate those rights compensable under 42 U.S.C. &#167 1985(3); (3) false arrest; (4) intentional infliction of emotional distress; and (5) negligent infliction of emotional distress. Defendants moved for summary judgment on all claims.
 
 
 14
 The district court found that the individual defendants were entitled to qualified immunity against Orin's First Amendment claims. The district court granted all defendants' motions for summary judgment as to Orin's remaining claims. Orin timely appealed.
 
 II.
 
 15
 A district court order granting summary judgment as to all claims and all parties constitutes a "final order " over which we have jurisdiction. 28 U.S.C. &#167 1291 (2000). We review a district court order granting summary judgment de novo, construing all evidence and drawing all reasonable inferences in favor of the non-moving party. See Wong v. Regents of the Univ. of Cal., 192 F.3d 807, 817 (9th Cir. 1999).
 
 A.
 
 16
 Section 1983 permits an individual whose federal statutory or constitutional rights have been violated by a public official acting under color of state law to sue the official for damages. 42 U.S.C. &#167 1983 (2000). Public officials are afforded protection, however, "from undue interference with their duties and from potentially disabling threats of liability." Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982). Qualified immunity shields them "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818. If a public official could reasonably have believed that his actions were legal in light of clearly established law and the information he possessed at the time, then his conduct falls within the protective sanctuary of qualified immunity. Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam).
 
 
 17
 To determine whether each individual defendant is entitled to qualified immunity, we must first determine whether Orin has stated a prima facie claim that a defendant violated his constitutional rights. Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 2155 (2001). If we determine that Orin has stated a prima facie claim that a particular defendant violated his constitutional rights, then we must determine whether the rights allegedly violated were clearly established by federal law. Id.
 
 
 18
 The Supreme Court has explained that a right is clearly established by federal law if:
 
 
 19
 The contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
 
 
 20
 Anderson v. Creighton, 483 U.S. 635, 640 (1987) (internal citations omitted). In other words, Orin's rights were clearly established if reasonable public officials in the defendants' respective positions would have known, "in light of clearly established law and the information the officers possessed," that their conduct violated his rights. Hunter , 502 U.S. at 227 (emphasis added).
 
 
 21
 Orin argues that the conditions imposed by Barclay and enforced by Wallace violated his First Amendment rights to free speech and the free exercise of religion. Barclay imposed three conditions on Orin's demonstration. The first two -not to create a public disturbance and not to interfere with campus activities or access to school buildings-are content-neutral regulations. See Hill v. Colorado, 530 U.S. 703, 719 (2000) (holding that regulation of expressive activity is contentneutral if it is justified without reference to the content of regulated speech). So long as such content-neutral regulations are narrowly tailored to accomplish a legitimate government purpose they are not proscribed by the First Amendment. Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989). The first two conditions survive constitutional scrutiny because they do not distinguish among speakers based on the content of their message and they are narrowly tailored to achieve OCC's pedagogical purpose. See Widmar v. Vincent, 454 U.S. 263, 268-69 (1981) (holding that a public university may"impose reasonable regulations compatible with [its educational] mission upon the use of its campus and facilities"); Healy v. James, 408 U.S. 169, 184 (1972) ("[A] college has a legitimate interest in preventing disruption on the campus.").
 
 
 22
 The third condition -to refrain from religious worship or instruction -is more problematic. "[P]rivate religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995). "Accordingly, we have not excluded from free-speech protections religious proselytizing, or even acts of worship." Id. (citations omitted). Protection of such expression on public property is not absolute, however. Id. The measure of protection afforded such expression is determined by the status of the public property on which it occurs. Public property may be designated, by law or tradition, as a public forum or may be set aside for some other public purpose. Id.
 
 
 23
 The record before us does not indicate whether OCC has, in general, designated its quad as a public forum. See Widmar, 454 U.S. at 267 n.5 ("We have not held . . . that a campus must make all of its facilities equally available to students and non-students alike, or that a university must grant free access to all of its grounds or buildings."); Souders v. Lucero, 196 F.3d 1040, 1044 (9th Cir. 1999) (noting that a public university may exclude from its campus a non-student whose conduct endangers a student). The parties do not dispute, however, that Dean Barclay told the demonstrators that they could use OCC's quad for expressive purposes so long as they observed three conditions. Having created a forum for the demonstrators' expression, Barclay could not, consistent with the dictates of the First Amendment, limit their expression to secular content. See Widmar, 454 U.S. at 267 (holding that once a university creates a forum, it must "justify its discriminations and exclusions under applicable constitutional norms").
 
 
 24
 The third condition imposed by Barclay constitutes a content-based regulation that we may uphold only if it "is necessary to serve a compelling state interest and .. . is narrowly drawn to achieve that end." Widmar, 454 U.S. at 270. Barclay informed Orin that this condition was required by the Establishment Clause in order to maintain the separation of Church and State. The Supreme Court has ruled, however, that the First Amendment does not require public institutions to exclude religious speech from fora held open to secular speakers. In fact, it prohibits them from doing so.
 
 
 25
 In Widmar, a public university defended its regulation excluding religious student organizations from campus facilities on the grounds that it was required by the Establishment Clause to observe a strict separation of Church and State. Id. at 263. The Court rejected the university's argument, holding that allowing religious organizations the same access to school facilities enjoyed by secular organizations did not violate the Establishment Clause. Since the governmental interest that purported to justify regulation was based on a misunderstanding of the Establishment Clause, the Court struck the regulation down as a content-based regulation of First Amendment rights of assembly, free exercise, and free speech that was not narrowly tailored to serve a compelling government interest. Id. at 278.
 
 
 26
 Barclay's "no religion" condition runs squarely afoul of Widmar. Having permitted Orin to conduct a demonstration on campus, Barclay could not, consistent with the First Amendment's free speech and free exercise clauses, limit his demonstration to secular content. Widmar and its progeny clearly establish this proposition. See, e.g., Rosenberger v. Rectors and Visitors of the Univ. of Va., 515 U.S. 819, 842 (1995). See also Good News Club v. Milford Cent. Sch., 121 S. Ct. 2093, 2104 (2001). Orin's First Amendment rights, in the context of this case, were clearly established. A reasonable public official should have known that permitting Orin to express his views on abortion only so long as those views were not religious in nature violated his First Amendment rights. We reverse the district court's holding that Barclay has qualified immunity against Orin's First Amendment claim and remand for trial.
 
 
 27
 We must also reverse the district court's determination that security officer Wallace had qualified immunity against Orin's First Amendment claim. At the summary judgment stage, the "threshold question" in determining whether a public official has qualified immunity is whether,"[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Saucier, 121 S. Ct. at 2156. It is unclear on the record before us whether Wallace asked Orin to leave campus because he had violated Barclay's "no religion " condition or because he had violated one of the other two, inoffensive conditions. Construing the facts in the light most favorable to Orin, as we must at this stage, he has properly alleged that Wallace violated his clearly established First Amendment rights. Accordingly, we reverse the district court's determination that Wallace is entitled as a matter of law to qualified immunity against Orin's First Amendment claim.
 
 
 28
 The district court properly held that police officers Hornberg and McCluskey have qualified immunity. The undisputed evidence indicates that they arrested Orin not because of the religious content of his speech, but rather because they reasonably believed they had probable cause to arrest him for trespass and failure to disperse. Police dispatch informed Hornberg only that a group of protestors was inciting a large, unruly crowd. Security officer Wallace told Hornberg only that the demonstrators had violated the conditions of their revocable license to remain on campus and were creating an unsafe, potentially riotous situation. Hornberg's personal observation of the demonstration confirmed these reports -he witnessed forty to fifty angry people shouting at the demonstrators. The record confirms that Hornberg could reasonably have believed that he was not violating Orin's First Amendment rights because he had probable cause to arrest Orin for violating Washington's laws pertaining to trespass and failure to disperse.
 
 
 29
 Similarly, Hornberg informed McCluskey that he asked Orin to leave because he was creating a disturbance and blocking entrance to school buildings and that he arrested Orin for trespass and failure to disperse. Based on this information, McCluskey could reasonably have believed that his direction to Hornberg to take Orin to jail for booking did not violate any of Orin's constitutional rights. We affirm the district court's decision that, because police officers Hornberg and McCluskey had probable cause to act against Orin under the Fourth Amendment, they did not violate his First Amendment rights.
 
 
 30
 Finally, the City of Bremerton is not liable on Orin's First Amendment claim. A plaintiff properly alleges a &#167 1983 action against a local government entity only if "the action that is alleged to be unconstitutional implement[ed] or execute[d] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," Monell v. Dep't of Soc. Serv. of N.Y., 436 U.S. 658, 690 (1978), or "the city made a `deliberate' or `conscious' choice to fail to train its employees adequately." Mackinney v. Nielsen, 69 F.3d 1002, 1010 (9th Cir. 1995). A &#167 1983 action against a city fails as a matter of law unless a city employee's conduct violates one of the plaintiff's federal rights. Because the record reveals that neither Officer Hornberg nor Officer McCluskey violated Orin's First Amendment rights, it follows as a matter of course that Orin's action against the City of Bremerton fails. The district court's grant of summary judgment in favor of the City of Bremerton is therefore affirmed.
 
 
 31
 Orin argues that the district court erred by dismissing his claim under 42 U.S.C. &#167 1985(3). Section 1985(3), originally enacted by the Reconstruction Congress as the Klu Klux Klan Act of 1871, provides in pertinent part:
 
 
 32
 If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so . . . deprived may have an action for the recovery of damages occasioned by such . . . deprivation, against any one or more of the conspirators.
 
 
 33
 42 U.S.C. &#167 1985(3) (2000).
 
 
 34
 To prove a violation of &#167 1985(3), Orin must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971) (emphasis added). Nothing in the record indicates that any of the defendants' actions were motivated by "invidiously discriminatory animus." Accordingly, we hold that the district court properly granted summary judgment in favor of the defendants on Orin's &#167 1985(3) claim because Orin failed "to make a showing sufficient to establish the existence of an element essential to" his claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[4]
 
 C.
 
 35
 Orin's state law claim of false arrest fails because Hornberg and McCluskey had probable cause to arrest him. A police officer has probable cause to effect an arrest if "at the moment the arrest was made . . . the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the suspect had violated a criminal law. Beck v. Ohio, 379 U.S. 89, 91 (1964).
 
 
 36
 The information conveyed to Hornberg by police dispatch and security officer Wallace indicated only that the demonstrators had violated the conditions pursuant to which they had been permitted on campus, and that OCC security could no longer protect the demonstrators from a large, unruly crowd stirred to violence by the demonstrators' conduct. Orin offers no evidence that the police officers knew what those conditions were. Hornberg confirmed the dispatcher's information with his own observations upon his arrival at the OCC quad.
 
 
 37
 The facts then known to Hornberg were sufficient to establish probable cause to arrest Orin for criminal trespass under RCW &#167 9A.52.080 because a reasonable officer could have concluded that Orin had remained unlawfully on OCC's premises after being asked by college officials to leave. Hornberg also had probable cause to arrest Orin under Washington's failure to disperse statute, RCW &#167 9A.84.020. A person fails to disperse in violation of RCW &#167 9A.84.020 if he "congregates with a group of three or more other persons. . . [that] create[s] a substantial risk of causing injury to any person, or substantial harm to property" and "refuses or fails to disperse when ordered to do so by a peace officer." Orin was amidst an angry crowd of forty to fifty people. A prudent man observing the scene could easily have believed that the crowd created a substantial risk of injury or property damage.
 
 
 38
 "[P]robable cause is a complete defense to an action for false arrest and imprisonment." Hanson v. City of Snohomish, 852 P.2d 295, 301 (Wash. 1993) (en banc). The district court properly granted summary judgment dismissing Orin's false arrest claim.
 
 D.
 
 39
 Under Washington law, the elements of intentional infliction of emotional distress, also known as outrage, are: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." Rice v. Janovich, 742 P.2d 1230, 1238 (Wash. 1987). To establish the tort of outrage, Orin must show that the conduct giving rise to his claim was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Grimsby v. Samson, 530 P.2d 291, 295 (Wash. 1975) (en banc). Orin has simply not alleged that any named defendant engaged in any conduct that rises to the level of atrocity and incivility required by Washington law.[5]
 
 E.
 
 40
 To establish negligent infliction of emotional distress under Washington law, Orin must show that defendants breached a legal duty thereby causing Orin to suffer objective symptoms of emotional distress. See Hunsley v. Giard, 553 P.2d 1096, 1102-03 (Wash. 1976) (en banc). Such symptoms must be "susceptible to medical diagnosis and proved through medical evidence." Marzolf v. Stone, 960 P. 2d 424, 431 (Wash. 1998). Orin properly states that the defendants had a duty not to arrest him without probable cause. But Orin's arrest was supported by probable cause. Defendants therefore did not breach the duty alleged by Orin, and cannot be found negligent. Accordingly, the district court did not err by granting summary judgment dismissing Orin's claim for negligent infliction of emotional distress.
 
 III.
 
 41
 Each party shall bear its own costs on appeal. See Fed. R. App. P. 39. The judgment of the district court is
 
 
 42
 AFFIRMED in part; REVERSED in part; and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 OCC is a two-year junior college operated by the State of Washington.
 
 
 [2]
 McIntyre alleges that he was gesticulating to emphasize a point and that he struck the officer accidentally.
 
 
 [3]
 Orin also argues that the defendants violated his rights under the Fourth Amendment and the Equal Protection Clause. The Fourth Amendment claim was not alleged in Orin's Complaint, so we do not address it at length. It suffices to say that our analysis of qualified immunity with regard to Orin's First Amendment claim is equally applicable to his Fourth Amendment claim.
 Orin made only passing reference to Equal Protection in his Complaint and dedicated to it only one sentence in his opening brief on appeal. Because Orin's Equal Protection claim appears to be no more than a First Amendment claim dressed in equal protection clothing, we heed the advice of an enlightened treatise:
 It is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights.
 John E. Nowak, Ronald D. Rotunda & J. Nelson Young, Handbook on Constitutional Law (1978). Accordingly, we treat Orin's equal protection claim as subsumed by, and co-extensive with, his First Amendment claim.
 
 
 [4]
 Nor is it clear that Orin qualifies as a member of a class to which the protections of &#167 1985(3) apply, either by being an abortion protestor or by being a speaker who would convey a religious message on a public college's campus. The term "class," as used in the statute "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the &#167 1985(3) defendant disfavors." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 269 (1993). The Supreme Court has held that "opposition to abortion" does not identify a "class" protected by &#167 1985(3). Id. We have held that &#167 1985(3) extends "beyond race only when the class in question can show that there has been a governmental determination that its members require and warrant special federal assistance in protecting their civil rights. " Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1536 (9th Cir. 1992). Orin has made no such showing.
 
 
 [5]
 We need not address whether the conduct of Orin's jailers would constitute outrage because Orin did not name them as defendants. We also need not address whether the City of Bremerton can be held liable for the jailers' conduct because Orin does not allege that their conduct was the result of lack of training or a pattern, practice, or custom of mistreating prisoners.
 
 
 BOOCHEVER, Circuit Judge, concurring:
 
 43
 I concur in the result reached by the majority. Because I believe Officers Hornberg and McCluskey are entitled to qualified immunity, I agree that we should affirm the district court's grant of summary judgment to these defendants. However, the majority opinion goes beyond what is necessary for qualified immunity analysis, concluding that Officers Hornberg and McCluskey did not violate Orin's First Amendment rights because they had probable cause to arrest him for trespass and failure to disperse. In my view, these additional conclusions are unnecessary and unwarranted. Because the qualified immunity question is sufficient to dispose of the case against Officers Hornberg and McCluskey, our analysis need not go further. Moreover, I cannot agree with the majority's conclusion that the officers had probable cause to arrest Orin.
 
 
 44
 Probable cause to arrest without a warrant exists when the facts and circumstances known to the arresting officer are sufficient to lead a prudent person to believe the suspect has committed, is committing, or is about to commit a crime. Mackinney v. Nielsen, 69 F.3d 1002, 1005 (9th Cir. 1995). Viewing the facts in the light most favorable to Orin, as we must on summary judgment, no prudent person would have thought Orin was doing anything illegal. To the contrary, the record suggests that Orin was arrested because the police and campus security were afraid that observers of the protest were getting violent and would harm the protesters. The majority cites no authority, and I am aware of none that indicates the hostile reaction of an audience to a speaker creates probable cause to arrest that speaker.
 
 
 45
 Under Washington law, the elements of failure to disperse are 1) "congregat[ing] with a group of three or more other persons [when] there are acts of conduct within that group which create a substantial risk of causing injury," and 2) "fail[ing] to disperse when ordered to do so by a peace officer." Wash. Rev. Code &#167 9A.84.020(1) (2001) (emphasis added). However, there were only two other members of Orin's group, so the police could not have observed Orin congregating with "three or more persons." More importantly, viewing the facts in Orin's favor, neither he nor members of his group were engaging in conduct that created a substantial risk of injury.[1] Even if members of the crowd were engaging in such conduct, that did not create probable cause to arrest Orin for failure to disperse.
 
 
 46
 A person is guilty of trespass if "he knowingly enters or remains unlawfully in or upon premises of another. " Wash. Rev. Code &#167 9A.52.080(1) (2001). If the property in question is a public place, however, a person's presence there is not unlawful as long as the person has complied with"all lawful conditions imposed on access to or remaining in the premises." Id. &#167 9A.52.090(1); State v. Finley, 982 P.2d 681, 686 (Wash. Ct. App. 1999); State v. R.H., 939 P.2d 217, 219-220 (Wash. Ct. App. 1997). In other words, if the premises are open to the public, violating a lawful condition of access is a necessary element of criminal trespass under Washington law. See R.H., 939 P.2d at 220.
 
 
 47
 In the present case, Orin provided evidence that the protesters were complying with the lawful, content-neutral conditions imposed by Dean Barclay. The campus security officers admitted that the protesters complied when asked to move away from entrances to buildings. Officer Hornberg, in his deposition, did not mention seeing Orin blocking access to buildings or otherwise violating Dean Barclay's lawful conditions. Upon arriving on campus, Officer Hornberg observed the protesters standing with their backs against a planter box, and feared violence on the part of a crowd encircling the protesters, not violence by the protesters themselves. Thus, the only information available to Hornberg that indicated Orin might be breaking the law was Wallace's statement that the protesters were violating conditions imposed on them by Dean Barclay. Before Orin was arrested, however, Orin specifically told Hornberg that Barclay and Wallace wanted the protesters to leave only because they were talking about religion. This undermined Hornberg's reason for believing Orin was trespassing, and should have put him on notice that Orin was not violating any lawful conditions placed on access to the campus. Under these circumstances, I cannot agree with the majority's conclusion that there was probable cause to arrest Orin for trespass.
 
 
 48
 In performing their jobs, police officers must often make split-second judgments in dangerous situations. Qualified immunity recognizes that they sometimes make mistakes, and protects them from liability when their mistakes are reasonable. See, e.g., Saucier v. Katz, ___U.S.___, 121 S.Ct. 2151, 2158 (2001). Because I believe Officers Hornberg and McCluskey were mistaken, but reasonably so, I agree they are entitled to summary judgment. I cannot join the majority opinion, however, to the extent it concludes that the hostile reaction of an audience to a speaker creates probable cause to arrest that speaker. In my view, "the proper response to potential and actual violence is . . . to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." Collins v. Jordan, 110 F.3d 1363, 1372 (9th Cir. 1996).
 
 
 
 Notes:
 
 
 [1]
 There was evidence that one of the protesters, McIntyre, swung at a campus security officer, knocking the officer's hat off his head. However, McIntyre claimed this was an accident. At any rate, viewing the facts in Orin's favor, this incident does not amount to conduct on the part of the protesters that would create a "substantial risk of injury."