**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAWANA PORTER,
   *Plaintiff-Appellant,*

v.

CALIFORNIA DEPARTMENT OF
CORRECTIONS,
   *Defendant-Appellee.*

No. 02-16537

D.C. No.
CV-00-00978-FCD

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, District Judge, Presiding

Argued and Submitted
February 11, 2004—San Francisco, California

Filed September 10, 2004
Amended August 5, 2005

Before: Mary M. Schroeder, Chief Judge,
Richard C. Tallman, and Consuelo M. Callahan,
Circuit Judges.

Opinion by Judge Callahan

10141

**COUNSEL**

Steven A. Hirsch and Daniel E. Jackson, Keker & Van Nest, San Francisco, California, for the plaintiff-appellant.

Bill Lockyer, Attorney General; Jacob A. Appelsmith, Senior Assistant Attorney General; Vincent J. Scally Jr., Supervising Deputy Attorney General; and Diana L. Cuomo, Deputy Attorney General, Sacramento, California, for the defendant-appellee.

## ORDER

The opinion filed September 10, 2004, slip op. at 13197, is amended as follows:

Slip op. at 13197:

> Delete the semicolon after "Opinion by Judge Callahan" and "Dissent by Judge Tallman"

Slip op. at 13210:

> Delete Subsection "1." entitled "Quid Pro Quo Harassment"

Slip op. at 13211:

> Delete Subsection "a." entitled "Porter's Prima Facie Case of Quid Pro Quo Harassment"

Slip op. at 13213:

> Delete Subsection "b." entitled "CDC's Legitimate Reason and Porter's Evidence of Pretext"

Slip op. at 13215:

> Renumber Subsection "2." entitled "Hostile Environment" as Subsection "1." and add the following introductory paragraph and footnote:

Porter's briefing does not specify whether she is alleging quid-pro-quo or hostile work environment sexual harassment. Since the facts are sufficient to establish a prima facie case of hostile work environment harassment, however, we leave for another day the question of whether quid-pro-quo liability attaches when an alleged harasser, who was not in a position to exact reprisals at the time his advances were rejected, is subsequently entrusted with and abuses such authority. n3

n3   In order to establish a prima facie case of quid-pro-quo sexual harassment, Porter must show that Wheeler or DeSantis "explicitly or implicitly conditioned a job, a job benefit, or the absence of a job detriment, upon [her] acceptance of sexual conduct." *Heyne v. Caruso*, 69 F.3d 1475, 1478 (9th Cir. 1995) (internal citation and quotation marks omitted).

Slip op. at 13222:

Delete Judge Tallman's dissent.

The petition for rehearing is otherwise **DENIED**. *See* Fed. R. App. P. 40. The suggestion for rehearing en banc is **DENIED**. *See* Fed. R. App. P. 35. No further petitions for rehearing or rehearing en banc will be accepted. The mandate shall issue forthwith.

---

## OPINION

CALLAHAN, Circuit Judge:

In May 2000, Lawana Porter filed a complaint pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, against

the California Department of Corrections ("CDC"). Porter alleged that she was the victim of continuing sexual harassment, discrimination and retaliation as a result of her rejection of sexual advances by correctional officers Terry Wheeler and Pete DeSantis in 1995 and 1996.

The district court granted the CDC's motion for summary judgment, holding that (1) the temporal gap between the complaints of sexual harassment and the alleged acts of retaliation precluded Porter from showing a causal link; and (2) the alleged incidents of sexual harassment could not be considered with the allegations of retaliation for the purpose of stating a viable cause of action.

On appeal, Porter makes two primary arguments. First, she argues that the district court erred in holding as a matter of law that she could not prove her retaliation claim because too much time elapsed between her reports of harassment and the CDC's retaliatory acts. Second, she asserts that the district court erred in holding as a matter of law that her sexual harassment claim was barred because "the many hostile acts directed against her within the limitations period bore no relation to the pervasively hostile working environment on which she based her claim."

We agree with Porter and reverse the district court. We hold that, although Porter's claims for harassment in 1995 and 1996 are time-barred, Porter is not precluded from attempting to show a causal link between the earlier harassment and more recent alleged acts of discrimination or retaliation.

## I.  Background

Porter has been employed as a correctional officer by the CDC since June 1995. In opposition to the CDC's motion for

summary judgment, she offered sufficient evidence to support the inferences and allegations detailed below.[1]

## A.   Wheeler

Shortly after Porter started working at the CDC, Sergeant Wheeler began visiting her while she was on duty and asked her to go out with him. Porter declined, stating that she had been taught at the academy that subordinates did not date supervisors.

A few days later, Wheeler asked Porter to go to Reno with him and when Porter declined, Wheeler told her to talk to her "buddy," Correctional Officer Pat Thompson. At that time, Porter was living with Thompson and his wife. When Porter got home, Thompson told her that CDC was getting ready to "roll-over" part-time employees to full-time, and that he and Wheeler had made a deal that if Thompson arranged for Porter to go to Reno with Wheeler, Wheeler would make sure that Thompson was rolled over to full-time employment.

A couple of days later, when Porter crossed a patio at work, Wheeler yelled her name and asked her if she had talked to her "buddy" about the Reno trip. Porter said she had and she was not going. Wheeler told her she would go to Reno with him because he "owned her." When Porter turned away, Wheeler raised his voice and threatened that "nobody walks away from me."

After this incident, Porter told a sergeant about Wheeler's conduct. A lieutenant then asked Porter to submit a written report, which she did on November 19, 1995. Porter subsequently met with one of the CDC's equal employment opportunity ("EEO") counselors, who prepared a written sexual

---

[1]On a motion for summary judgment the court examines the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

harassment complaint. Lieutenant McDonald was assigned to conduct an investigation.

McDonald concluded his investigation at the end of January 1996. He determined that Wheeler had asked Porter out on dates and spoken to Thompson about his desire to date Porter. In February 1996, an "Employee Counseling Record" was placed in Wheeler's supervisory file for three months. Wheeler was instructed to "cease any further behavior on the work site toward [Porter] 'of a personal nature' " and to attend the next sexual-harassment prevention class.

Later in 1996 or 1997, when Porter was working under Wheeler's supervision, Wheeler began to eat her Chinese food during a meal break. When Porter complained, Wheeler spat into the food and handed it back to Porter. Porter perceived this as retaliatory because she had reported him for sexual harassment. In early January 1998, Wheeler went to the Office of Personnel Assignments ("OPA") to prevent Porter from working on the Lassen Yard. At another time, Wheeler told another sergeant in Porter's presence, "what is that fucking bitch doing on my yard?"

## B.   DeSantis

A week before her scheduled interview with McDonald in 1995, Porter contacted Correctional Officer Pete DeSantis, president of the local chapter of the California Correctional Peace Officer Association ("CCPOA"), and asked him to represent her. A couple of days after the interview, DeSantis telephoned Porter at home in the late evening and inquired if she was feeling better. Porter stated that she would feel better if the investigation was over. DeSantis responded that he could make her feel better. He told her that he "could make her crawl all over her bed with his tongue."

A couple of days later, in another phone call, DeSantis again asked Porter if she was feeling better. When she replied

that she was not, DeSantis reminded her of how he could make her feel better. Porter unsuccessfully attempted to steer the conversation back to the investigation and then told DeSantis that she had to get off the phone.

A few days, later DeSantis called Porter at home to tell her about the CDC's Winter Dance Festival. He told her she should attend and stated that she would be safe because his wife would be there. The following day DeSantis called Porter and asked if she wanted to go to Reno with him to pick up union supplies. Porter told him she was not interested. Porter did go to the Winter Dance. While there, DeSantis motioned to her to come up to him and, pointing out his wife, indicated that Porter was safe because his wife was there.

Shortly thereafter, DeSantis called Porter at home and asked her to go with him to a union convention in Sacramento. He said they would get two rooms, but stay together until his wife got there. He asked Porter to bring a purple negligee. Porter said she was not interested. In a subsequent telephone conversation she agreed to go, but in a later conversation "she became angry with DeSantis and changed her mind." Porter called DeSantis an "asshole," and told him what he was doing was wrong. When she asked what would happen if she told his wife, DeSantis responded that he had already told his wife that Porter was a "whore." Thereafter, DeSantis ceased calling.

These conversations occurred between November 1995 and February 1996. Porter did not complain to the CDC about DeSantis nor did she request new union representation. Porter alleges that she told Lieutenant McDonald, during his investigation of Wheeler, about DeSantis' comments at the Winter Dance and his invitation to go to Reno.

## C.  Reprisals

DeSantis became a sergeant in February 1996. Porter alleges that in July 1996, DeSantis told correctional officer

Scott Porter, Porter's then boyfriend and now husband, that he better "watch out," that Porter was a "whore" and would sleep with anyone.

In August 1997, shortly after Porter finished her apprenticeship program, she called OPA seeking to be assigned a post other than a first watch post.[2] DeSantis told her that there were no jobs available. Porter checked the master list and saw that other watches were available. She again called OPA and talked to Officer Leitaker, who worked under DeSantis. Porter heard "DeSantis tell Leitaker that there were currently no jobs open, *for her.*" (Emphasis in district court's decision.)

In January 1998, Porter was assigned to a second watch job, and at around the same time, DeSantis became the Personnel Assignment Sergeant in OPA. Porter went to OPA five or six times in 1998 and verbally requested vacations and holidays. Each time she asked DeSantis if there were any open holidays, he told her, in front of Officer Leitaker, "not for you."

Porter also sought three different transfers in 1998. In May, Porter requested a transfer to post R0227, even though Wheeler was the supervising officer for part of the post. Porter did not receive the assignment, and she alleges that DeSantis denied her the post and gave it to Pat Thompson. In June 1998, Lieutenant Anglea asked Porter if she was interested in post R0245. According to Porter, Wheeler, who was the supervisor for part of the post, went to DeSantis and told him that he did not want Porter. DeSantis did not give the post to Porter.

That same month, Sergeant Knigge asked Porter if she wanted to transfer to R0222. Porter expressed interest, so Knigge filled out an assignment-change request, and in July 1998, Lieutenants Orr and Anglea signed off on the assign-

---

[2]The first watch is from 10:00 p.m. to 6:00 a.m.

ment change. DeSantis cancelled the transfer. Porter contends that Orr and Leitaker were surprised by DeSantis' actions and considered the cancellation suspicious. The CDC, however, presented evidence that another sergeant had contacted DeSantis and complained that his unit was assigned a disproportionate number of apprentices compared to other units. The CDC represented that DeSantis reviewed the distribution, determined it was disproportionate, and remedied the problem by utilizing post R0222 as an apprentice position.

In September, after DeSantis cancelled Porter's transfer to post R0222, Lieutenant Anglea asked Porter, "What did you do to piss DeSantis off?" When Porter told Anglea about DeSantis' prior actions, Anglea filed a complaint and reported the matter to Margene Ford, the Associate Warden, and to the CDC's EEO Coordinator, without asking Porter if she desired such recourse. Subsequently, the warden decided that an EEO investigation was required.

Between September and November 1998, Porter met several times with Ford. Porter asked Ford not to have anyone local investigate the complaint and Ford agreed. Nonetheless, Porter received an interview memorandum stating that a Sacramento office of the CDC had appointed a local officer to interview Porter. When Porter called the CDC's EEO office in Sacramento, the office said that it knew nothing about the appointment. Porter was called for a meeting with Ford. Ford was angry and yelled at Porter for going "over her head" to Sacramento. Ford told Porter that things were going to get rougher; she asked Porter, "what the hell's wrong with you?" Ford said, "I'm telling you, you can trust me and you're looking at me like I'm a liar."

The Discrimination Complaint Unit of the CDC asked Porter to prepare a handwritten report of her complaint, which she did on October 15, 1998. Porter also filed a formal complaint for retaliation and sexual harassment. On one occasion during the investigation, DeSantis stood with his arms

crossed, and stared at plaintiff for almost five minutes. The investigation ended in February 1999 with a determination that Porter's factual allegations were not sustained.

Porter filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on April 21, 1999, and filed her civil action on May 3, 2000.

Meanwhile, Porter was off work on medical leave from November 6, 1998, to September 5, 2000. In December 1998, the union president called Porter at home and told her that she was not to come on the grounds of the CDC because she was a liability. In January 1999, Porter received a memo from the CDC stating that she had failed to get her annual tuberculosis test and warning that if she did not get one, she would be subject to disciplinary action up to and including termination. Porter was told by the Return to Work Coordinator at the CDC that she would have to go to her personal physician because she was not allowed on the grounds.

In addition, while still on medical leave, Porter continued to receive notices of job changes and calls at home that she was absent without leave. She received a memo stating that she had failed to take a mandatory Use of Force Class and was subject to disciplinary action up to and including termination. She also discovered that a negative performance evaluation that was supposed to have been removed from her file was still in her file.

Once she returned to work, Porter was told she should use the back gate "so that she would have limited contact with correctional staff." When she called the watch office to check in at the back gate, the office would hang up on her or insult her. In January 2001, when Porter was working at an entrance at which she was required to check all identification cards before allowing anyone to enter, a number of officers refused to present their identification cards and began yelling and

kicking the doors, banging the windows, and yelling obscenities and personal insults.

## II.   The District Court's Decision

The district court found that pursuant to 42 U.S.C. § 2000e-5(e)(1) Porter was required to file an employment discrimination charge with the EEOC within 300 days after the "alleged unlawful employment practice occurred." The court concluded that because Porter filed her complaint with the EEOC on April 21, 1999, her claims were barred if based on acts that occurred prior to June 26, 1998.

Reviewing the Supreme Court's then recent opinion in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002), the district court granted the CDC's motion for summary judgment, holding that (a) Porter's allegations based on a sexually hostile work environment in 1995 and 1996 were barred by her failure to file a claim within 300 days of any one of the acts; (b) the more recent allegations of harassment or retaliation were different in nature than the earlier allegations of sexual harassment and, therefore, could not be part of a continuing violation; and (c) pursuant to *Clark County School District v. Breeden*, 532 U.S. 268 (2001), the passage of time barred Porter from showing a causal link between protected activity and adverse employment action. Alternatively, the district court also found that Porter had not presented evidence indicating that the CDC's reasons for executing the adverse employment actions were merely pretexts for retaliation.

## III.   Standard of Review

Summary judgment is proper if the materials before the district court "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 321, 322 (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630-31 (9th Cir. 1987). However, once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

We review the district court's order granting summary judgment de novo, drawing "all reasonable inferences supported by the evidence in favor of the non-moving party." *Villiarimo v. Aloha Island Air, Inc.* 281 F.3d 1054, 1061 (9th Cir. 2002). "In reviewing an order denying or granting summary judgment, we must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Ray v. Henderson*, 217 F.3d 1234, 1239-40 (9th Cir. 2000).

## IV.    Discussion

### A.    Sexual Harassment

In *Morgan,* the Supreme Court held that an employee such as Porter, who initially files a charge of discrimination with a state agency in a state like California, must file a charge with the EEOC within 300 days of the alleged unlawful employment practice in order to preserve the claim for a subsequent civil action under 42 U.S.C. § 2000e-5(e)(1). 536 U.S. at 109. The Court explained:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts

alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the . . . 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Id.* at 113.

Thus, the district court correctly determined that any claim that Porter sought to assert for a discrete discriminatory act that occurred before June 26, 1998, was not actionable. Nonetheless, the district court failed to appreciate evidence indicating that at least one discrete act had occurred within the 300-day time frame; in particular, DeSantis' decision to deny Porter's request to transfer to the R0222 position. *See id.* at 114 (listing the "denial of transfer" as one example of a discrete act).

## 1.  Hostile Environment

Porter's briefing does not specify whether she is alleging quid-pro-quo or hostile work environment sexual harassment. Since the facts are sufficient to establish a prima facie case of hostile work environment harassment, however, we leave for another day the question of whether quid-pro-quo liability attaches when an alleged harasser, who was not in a position to exact reprisals at the time his advances were rejected, is subsequently entrusted with and abuses such authority.[3]

---

[3]In order to establish a prima facie case of quid-pro-quo sexual harassment, Porter must show that Wheeler or DeSantis "explicitly or implicitly

We now turn to Porter's hostile-environment claim and the question of whether it is time barred. In order for this claim to survive summary judgment, Porter must show that: (1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment. *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2004). The district court did not analyze whether Porter had submitted evidence to create a genuine issue of material fact as to these elements, but found that the claim was time barred.

**[1]** In *Brooks v. City of San Mateo*, we suggested that a hostile environment may result from a single instance of sexual harassment if the harassing conduct is sufficiently severe. 229 F.3d 917, 925-27 (9th Cir. 2000). With the exception of sexual assault, few types of harassing conduct are more extreme than thrusting explicit sexual propositions toward an employee and then executing reprisals against her for resisting the advances.

Given that, it would be tempting to conclude that all the offensive activities that Porter allegedly encountered between 1995 and 2001 are both timely and actionable as different "part[s] of the same unlawful employment practice." *Morgan*, 536 U.S. at 122. But we believe that such an approach would blur to the point of oblivion the dichotomy between discrete acts and a hostile environment. *See id*. at 114-15.

**[2]** As the Supreme Court emphasized, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id*. at 113; *see also Cherosky v. Henderson*, 330 F.3d 1243, 1245-47 (9th

---

conditioned a job, a job benefit, or the absence of a job detriment, upon [her] acceptance of sexual conduct." *Heyne v. Caruso*, 69 F.3d 1475, 1478 (9th Cir. 1995) (internal citation and quotation marks omitted).

Cir. 2003) (declining to treat a series of related employment decisions as a pattern or practice, but finding that each decision was a discrete act). Consequently, we refuse to mix recent discrete acts like tinder with the planks of ancient sexual advances and then, regardless of whatever it was that set the spark in the furnace, call the fire that ignites therefrom a hostile environment. If the flames of an allegedly hostile environment are to rise to the level of an actionable claim, they must do so based on the fuel of timely non-discrete acts.[4]

[3] When the ashes are sifted, the bulk of the conduct attributed by Porter to the CDC and its agents falls into the category of discrete acts; for instance, refusing to grant Porter's requests for vacation or holidays, requiring Porter to be tested for tuberculosis by her own physician, threatening disciplinary action while she was on medical leave, leaving a negative performance evaluation in her personnel file, and instructing her to enter the work site through the back gate. That leaves the following allegations of non-discrete acts: Wheeler and DeSantis sexually propositioned Porter and made offensive comments to her or about her in 1995 and 1996; Wheeler ate and then spat in Porter's food in 1996 or 1997; Wheeler referred to her as a "fucking bitch" when she showed up on his yard in 1998; DeSantis told another correctional officer that Porter was a "whore" in 1996 and glared at her during the investigation that commenced in October 1998; Ford made angry remarks to her in 1998; and unnamed officers began yelling insults and obscenities at her when she demanded to see their identification in 2001.

Obviously, some of these alleged events occurred after June 26, 1998. Thus, to determine whether all of these events constitute "one unlawful employment practice," *Morgan*, 536

---

[4]Of course, discrete acts still may be considered for purposes of placing non-discrete acts in the proper context. *See Morgan*, 536 U.S. at 113 ("Nor does the statute bar an employee from using the prior acts as *background* evidence in support of a timely claim.") (emphasis added).

U.S. at 118, we consider whether they were "sufficiently severe or pervasive," and whether the earlier and later events amounted to "the same type of employment actions, occurred relatively frequently, [or] were perpetrated by the same managers." *Id.* at 116, 120 (citations and internal quotation marks omitted).

Analyzing the more recent allegations first, there is nothing to suggest that Ford's statements or the insults hurled by unnamed officers were sexually charged, or that these statements would not have been directed toward Porter if she was a man. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (confirming that Title VII is not "a general civility code for the American workplace"). Likewise, there is no evidence linking these comments and contumelies to the actions of Wheeler or DeSantis. Thus, the messages dispatched to Porter by Ford and the unnamed officers are not connected to the same hostile-environment practice as the conduct ascribed to Wheeler and DeSantis. Moreover, standing by themselves, these statements are not sufficiently severe or pervasive to support a hostile-environment claim.

The remaining allegations all concern behavior on the part of Wheeler and DeSantis, some of which occurred after June 26, 1998. In particular, DeSantis glared at Porter in an intimidating fashion sometime after October 1998, and Wheeler referred to her in derogatory terms at some unspecified point that same year. While the record does not suggest that DeSantis and Wheeler harassed Porter frequently after 1997, it does indicate that their behavior at pertinent points between 1995 and 1998 involved the same type of sexist activity; to wit, intimidating or demeaning the value of female employees who do not submit to demands for sexual favors.

Of course, the conduct in which Wheeler and DeSantis allegedly engaged became less severe, humiliating and pervasive in 1997 and 1998 than it had been in 1995 and 1996. Nonetheless, the Supreme Court's holding in *Morgan* does

not call for the most egregious of the harassing events to occur within the 300-day period, nor does it demand that the harassing conduct continue to escalate over time in order for a hostile-environment claim to be actionable. 536 U.S. at 117.

**[4]** Viewed from this perspective, and in the light most favorable to Porter, the record contains sufficient evidence to permit an inference that Wheeler and DeSantis had created a sexually hostile environment that persisted beyond June 26, 1998. Much of their alleged verbal and physical conduct was of an unwelcome sexual nature and, when taken together as a whole, it was sufficiently severe *and* pervasive to create an abusive work environment. Therefore, we hold that Porter's hostile-environment claim is not time barred and remand to the district court for further proceedings consistent with this opinion. In so doing, we express no opinion as to whether the CDC may avail itself of the affirmative defense outlined by the Supreme Court in *Faragher*, 524 U.S. at 807-08.

## B.   Retaliation

In order to establish a prima facie case of retaliation, Porter must demonstrate that (1) she had engaged in protected activity; (2) she was thereafter subjected by her employer to an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action. *See Ray,* 217 F.3d at 1240. If Porter provides sufficient evidence to show a prima facie case of retaliation, the burden then shifts to the CDC to articulate a legitimate, non-retaliatory reason for its actions. *See id*. If the CDC sets forth such a reason, Porter bears the ultimate burden of submitting evidence indicating that the CDC's proffered reason is merely a pretext for a retaliatory motive. *See id*.

### 1.   Porter's Prima Facie Case of Retaliation

The district court found that Porter's evidence was sufficient to create a genuine issue of material fact as to the first

two prongs of the prima facie case. However, the court concluded, citing *Breeden*, that Porter could not show a causal link between the protected activity and the post change denials because of the temporal gap between these events. This determination misinterprets *Breeden*.

The plaintiff in *Breeden* claimed her transfer was in retaliation for her complaint about a comment her male supervisor made when reviewing job applications, and for her filing a complaint with the EEOC. 532 U.S. at 273. The Supreme Court questioned the merits of the plaintiff's underlying complaint[5] and stated that there was no indication that the assistant superintendent knew about the right-to-sue letter when she proposed transferring plaintiff. *Id.* The Court continued:

> [I]f one presumes she knew about it, one must also presume that she (or her predecessor) knew *almost two years earlier* about the protected action (filing of the EEOC complaint) that the letter supposedly disclosed. . . . The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close. Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Id.* at 273-74 (emphasis in original, internal quotation marks and citations omitted).

[5] *Breeden* cannot be read as holding that causality is dependent, as a matter of law, on temporal proximity. Although a lack of temporal proximity may make it more difficult to show causation, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also

---

[5]"No reasonable person could have believed that the single incident recounted above violated Title VII's standard." 532 U.S. at 271.

give rise to the inference." *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3rd Cir. 1997) (citation omitted). The Third Circuit explained:

> It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

*Id.* at 178.

Our cases are consistent with this approach. In *Coszalter v. City of Salem,* 320 F.3d 968, 977-78 (9th Cir. 2003), we cautioned that a "specified time period cannot be a mechanically applied criterion. A rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic." In *Winarto v. Toshiba America Electronics Components, Inc.,* 274 F.3d 1276, 1287 n.10 (9th Cir. 2001), the majority rejected the dissent's argument that *Breeden* precluded the inferences drawn by the jury below.

As a valid reason for the delay between her alleged protected activities and the claimed adverse actions, Porter points out that DeSantis was not in a position to retaliate until after he became the Personnel Assignment Sergeant in the OPA. This position finds support in both controlling and persuasive authorities. *See Keyser*, 265 F.3d at 752 n.4; *Kachmar*, 109 F.3d at 178. Moreover, Porter does not rely on "mere temporal proximity," *Breeden*, 532 U.S. at 273, but offers other evidence to support the inference of a retaliatory motive.

**[6]** For instance, the "not for you" sneers of DeSantis imply that Porter's shift, post or vacation requests might have been granted if they were from any employee except Porter. Moreover, as noted above, Porter's evidence permits an inference that DeSantis and Wheeler conditioned the terms and conditions of her employment, at least impliedly, on her submission to sexual conduct — which includes the connoted threat that the terms and privileges of her employment would be unfavorable if she spoke out against their propositions or otherwise refused them. Wheeler eating Porter's food without permission, and then spitting in what was left of it, and DeSantis's intimidating glare, are crude displays of each supervisor's willingness to carry through on the thinly-veiled deterrents. We therefore conclude that *Breeden* does not foreclose the inference of a causal link in this case, and hold that Porter's evidence established genuine issues of material fact to support her prima facie case of retaliation.[6]

## 2.  Porter's Evidence of Pretext

The district court further surmised that the CDC had offered a legitimate reason for denying Porter's transfer requests, and that Porter had failed to present evidence showing that the explanation was pretextual. Thus, the district court determined that the CDC was still entitled to summary adjudication of the retaliation claim even if Porter's evidence had established a prima facie case. We do not agree.

**[7]** Just as DeSantis's deviations from the CDC's protocol support an inference of pretext for purposes of Porter's quid pro quo claim, so too do these irregularities in the process permit an inference of pretext with regard to the retaliation claim. To conclude otherwise would be anomalous. Therefore, we reverse the district court's summary adjudication of this claim, and remand for further proceedings.

---

[6]On remand, the CDC may cite the passage of time as evidence of a lack of causation, but it will be for the trier of fact to make the ultimate determination.

## V.   Conclusion

Porter's allegations contend that she has been the victim of sexual harassment and retaliation almost from the day she accepted employment with the CDC. When she filed a complaint with the EEOC in 1999, her claims for sexual harassment in 1995 and 1996 were time barred. We hold, however, that she submitted sufficient evidence to establish genuine issues of material fact as to whether she had been subjected to sexually harassing conduct that continued into the limitations period, and whether the timely adverse employment actions that she allegedly suffered were reprisals for her protected activities.

**REVERSED AND REMANDED.**