

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-12-00442-CV

**SAN ANTONIO WATER SYSTEM**,
Appellant

v.

Debra **NICHOLAS**,
Appellee

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2010-CI-07444
Honorable Antonia Arteaga, Judge Presiding

Opinion by:     Sandee Bryan Marion, Justice

Sitting:        Sandee Bryan Marion, Justice
                Marialyn Barnard, Justice
                Luz Elena D. Chapa, Justice

Delivered and Filed:  October 23, 2013

AFFIRMED

Appellee Debra Nicholas sued appellant The San Antonio Water System ("SAWS") for retaliation under the Texas Commission on Human Rights Act based upon two alleged adverse employment actions: SAWS terminated her employment and SAWS refused to consider her or offer her employment for other positions with the company that she applied for after her employment was terminated.  Nicholas claimed both adverse actions arose from her opposition to a discriminatory practice when she counseled and reprimanded another employee for sexual

harassment. A jury returned a verdict favorable to Nicholas on both of her retaliation claims. We affirm.

## STANDARD OF REVIEW

Nicholas brought her retaliation claims under the Human Rights Act, which provides that "[a]n employer . . . commits an unlawful employment practice if the employer . . . retaliates or discriminates against a person who, under this chapter: (1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." TEX. LAB. CODE ANN. § 21.055 (West 2006). To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) it did so because of her participation in the protected activity. *Herbert v. City of Forest Hill*, 189 S.W.3d 369, 376 (Tex. App.—Fort Worth 2006, no pet.). It is the plaintiff's burden to prove that without her protected activity, the employer's prohibited conduct would not have occurred when it did. *See Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995) (applying standard to retaliation complaint under Whistleblower Act); *McMillon v. Tex. Dep't of Ins.*, 963 S.W.2d 935, 940 (Tex. App.—Austin 1998, no pet.) (applying standard to retaliation complaint under Human Rights Act). In other words, the plaintiff must establish a "but for" causal nexus between her protected activity and the employer's prohibited conduct. *McMillon*, 963 S.W.2d at 940. The plaintiff need not establish, however, that her protected activity was the sole cause of the employer's prohibited conduct. *Id.*

On appeal, SAWS asserts Nicholas failed to carry her burden of establishing a "but for" causal link between the alleged protected activity and the adverse action about which she complains. SAWS also asserts the evidence is factually insufficient to support the jury's findings that Nicholas engaged in a protected activity and that SAWS retaliated against her.

We first address Nicholas's contention on appeal that her prima facie case of retaliation creates a "legally mandatory inference of discrimination" that prevails unless SAWS produces a legally sufficient reason for her discharge. Nicholas argues that because SAWS provided only a generalized reason for her discharge—that her position was eliminated due to a company reorganization—it failed to rebut the presumption created by her prima facie case and, thus, the burden never shifted to her to show pretext or falsity. Nicholas's argument presupposes that the allocation of burdens and order of presentation of proof in a case alleging discriminatory treatment set forth by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies here. For the reasons set forth below, we disagree.

In *McDonnell Douglas*, the United States Supreme Court prescribed a burden-shifting analysis in Title VII employment discrimination cases. The plaintiff first has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Id.* at 802. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Third, if the defendant carries this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are not its true reasons, but were a pretext for discrimination. *Id.* at 804. While the burden of production shifts, the burden of persuasion that the employer intentionally discriminated against the employee remains always with the employee. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

"But when a discrimination case has been fully tried on its merits, as in this case, a reviewing court does not engage in a burden-shifting analysis." *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003) (per curiam); *Claymex Brick and Tile, Inc. v. Garza*, 216 S.W.3d 33, 36 (Tex. App.—San Antonio 2006, no pet.) (holding same). "[W]e need not now parse the

evidence into discrete segments corresponding to a prima facie case, an articulation of a legitimate, nondiscriminatory reason for the employer's decision, and a showing of pretext." *Rubinstein v. Administrators of Tulane Educ. Fund*, 218 F.3d 392, 402 (5th Cir. 2000). "'When a case has been fully tried on the merits, the adequacy of a party's showing at any particular stage of the *McDonnell Douglas* ritual is unimportant.'" *Id.* (internal citation omitted). Instead, we inquire whether the evidence is sufficient to support the jury's ultimate finding. *Canchola*, 121 S.W.3d at 739.

When, as here, a party challenges the legal sufficiency of the evidence to support an issue on which it did not have the burden of proof at trial, that party must demonstrate on appeal that there is no evidence to support the jury's adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). In reviewing for legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict, indulging every reasonable inference that would support it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). "But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.* To determine whether legally sufficient evidence supports a challenged finding of fact, the reviewing court must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.* Evidence is legally insufficient only if (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails and must be overruled. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). The fact-finder is the sole judge of

the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819.

If a party is attacking the factual sufficiency of the evidence to support an adverse finding on an issue on which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ). In addressing a factual sufficiency of the evidence challenge, an appellate court must consider and weigh all of the evidence in a neutral light. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). The verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* However, this court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

## PROTECTED ACTIVITY

The Human Rights Act protects an employee from retaliation or discrimination by an employer because the employee "opposed a discriminatory practice." TEX. LAB. CODE § 21.055(1). Opposition to a discriminatory practice is a protected activity under the Human Rights Act, irrespective of the merits of the underlying discrimination claim. *City of Waco v. Lopez*, 259 S.W.3d 147, 151 (Tex. 2008). To establish that the employee opposed a discriminatory practice, the employee must demonstrate a good faith reasonable belief that the underlying discriminatory practice of the employer violated the law. *Cox & Smith Inc. v. Cook*, 974 S.W.2d 217, 224 (Tex. App.—San Antonio 1998, pet. denied) (employee is not required to show actual existence of unlawful practice, only that she held a good faith reasonable belief that employer engaged in activity made unlawful by the Human Rights Act).

In *Cook*, a panel of this court held that the term "reasonable belief" includes both subjective and objective components. 974 S.W.2d at 225. A plaintiff must show that she subjectively (that is, in good faith) believed her employer was engaged in unlawful employment practices, and her belief was objectively reasonable in light of the facts and record presented. *Id.* at 225-26. Following *Cook*, we will evaluate Nicholas's claim by reviewing the evidence consistent with the jury's verdict to determine whether it supports a finding that she believed in good faith that Flores's conduct actually violated the Texas Labor Code. In addition, we will review the same evidence to determine whether it supports a finding that this belief was objectively reasonable in light of the circumstances presented, i.e., such as to cause a reasonable person to believe that Flores engaged in sexual harassment.

The jury was instructed that "[t]o oppose sexual harassment, Debra Nicholas's action in counseling and reprimanding Greg Flores for sexual harassment must have been based on a reasonable, good faith belief that his conduct actually violated the Texas Labor Code, even if she was ultimately mistaken." The jury found that Nicholas opposed sexual harassment, if any, by counseling and reprimanding Greg Flores. On appeal, SAWS contends the overwhelming weight of the evidence is that no sexual harassment occurred and no complaints of sexual harassment or threats of such complaints were made. SAWS points to the testimony of the two women involved who denied they were sexually harassed and never intended to make a complaint. SAWS also relies on conflicting testimony about the meeting in which Nicholas says she counseled/reprimanded Flores.

In 2006, a female paralegal for SAWS, Lisa Spielhagen, mentioned to SAWS general counsel, Frank Stenger-Castro, that Greg Flores had extended lunch invitations to her and she felt uncomfortable. At the time, Flores was the vice president over the customer service and communications/external relations departments. Also in 2006, SAWS training consultant, Sharon

Snoga, told SAWS employment lawyer, Bill Crow, that she had had a "weird" conversation with Flores. Crow in turn mentioned Snoga's comment to Stenger-Castro. Because Stenger-Castro thought Flores should be informed that Spielhagen did not welcome the lunch invitations because they were socially awkward, he went to Flores's supervisor, then CEO David Chardavoyne, and told him about the lunch invitations.

Chardavoyne testified Stenger-Castro came to his office one day and told him that Flores was repeatedly asking Lisa Spielhagen to lunch, she felt like she was being harassed, and if the lunch invitations did not stop she would file a formal complaint. Chardavoyne testified he did not want the human resources department involved, and he decided Nicholas should investigate Spielhagen's complaint and report back for the purpose of determining the next step, if any. Chardavoyne testified Nicholas reported to him that not only did Spielhagen have "an issue" with Flores, but so did another woman. Chardavoyne, along with Nicholas, later counseled or reprimanded Flores. According to Chardavoyne, Nicholas did not say much except to confirm what he told Flores. He said he told Flores to stop asking women out, and Nicholas said "you need to listen to Dave because what he's telling you is for your own good." Chardavoyne said he, Nicholas, and Flores also discussed rumored sexual harassment allegations made against Flores when he worked for HEB.

Nicholas testified that when she was called into the meeting by Chardavoyne, Stenger-Castro repeated what he had told Chardavoyne, that he was concerned there was a potential sexual harassment complaint regarding Spielhagen and Flores. Nicholas said Stenger-Castro thought it would be "a big embarrassment to SAWS" if a new vice president was charged with sexual harassment. According to Nicholas, Stenger-Castro said that if the lunch invitations by Flores did not stop, Spielhagen would file a sexual harassment complaint. She said Stenger-Castro said Sharon Snoga had a similar complaint, but he had not spoken to her. After Stenger-Castro relayed

his information, the three talked about how to approach Flores. She said Stenger-Castro did not think he should talk to Flores because if it was later proved that Flores was sexually harassing women, then it would be his department (legal) that would become involved in the case. She said they decided she and Chardavoyne would speak to Flores and, based upon what Flores said, they would determine what course of action to take. If Flores denied the lunch invitations, then they would need to investigate further.

On the other hand, Stenger-Castro testified Spielhagen neither complained about being sexually harassed nor told him she was going to file a complaint of sexual harassment against Flores. Stenger-Castro said he "made it very clear" in his conversation with Chardavoyne that he had asked Spielhagen "is this a sexual harassment complaint, and that she said no." He also stated he did not tell Chardavoyne or Nicholas that Spielhagen said she would file a formal complaint if Flores's lunch invitations did not stop. He said he went to Chardavoyne out of an abundance of caution because once an employee says she does not want to be invited to lunch by a senior employee, he had an obligation to communicate that to Chardavoyne as Flores's immediate supervisor. He stated that based on his experience and years as general counsel he did not believe it was a good idea, "especially when somebody said they don't want to, for senior management to socialize with lower-level employees. I think it's risky . . . ." However, he did not believe Flores's behavior violated SAWS's sexual harassment policy. Stenger-Castro thought Chardavoyne did not think it was anything to be concerned about, but he asked that Nicholas come into their meeting so that she could talk to Flores about the situation. Stenger-Castro did not recall Chardavoyne telling Nicholas to conduct an investigation. Stenger-Castro said he asked Nicholas about two or three months later if she had spoken to Flores and she said she had not yet done so.

Nicholas testified Flores admitted at the meeting with her and Chardavoyne that he had asked the women to lunch, but he did not intend to sexually harass them. She said he also admitted

he had seen Snoga in the cafeteria and commented on how nice she looked and that he was sorry that happened and he would stop. She said Chardavoyne told Flores he would not allow a member of the Executive Management Team ("EMT") to sexually harass anyone. She said she reinforced what Chardavoyne said and she told Flores "it was not a good idea for him to be going out with women in the organization or people . . . in the organization by himself. [O]ne, he's a VP and, two, he's married. And it's not a good idea to do that. And it can be construed as inappropriate." She also said she told Flores "to protect his own job, . . . if he continued to do it, he could lose his job." When asked if this meeting was, in her mind, a counseling or reprimand to prevent potential sexual harassment by Flores," she responded "Absolutely." When asked if it was her belief that her counseling or reprimand of Flores was designed to prevent any potential sexual harassment, she responded "Yes, sir, because Frank Stenger-Castro, who is general counsel, told us that if it didn't stop, Lisa Spielhagen would file a complaint." Nicholas admitted she did not speak with either Spielhagen or Snoga, she did no investigation, and she did not document the meeting with Flores.

Flores testified he sent Snoga an email in February 2006 asking her if she wore colored contacts; and another email asking her if she was making an indecent proposal. He said he was unaware Snoga considered his behavior weird and unprofessional. Flores said two rumors were discussed at the 2006 meeting with Chardavoyne and Nicholas. One rumor was that he had been dismissed by a former employer for sexual harassment and the other rumor was that Chardavoyne and Nicholas were having an affair. Flores denied that a conversation about him asking women to lunch and about Spielhagen's complaints, or a conversation in which he was reprimanded or counseled ever took place.

It was the jury's prerogative to decide whose version of the meeting to believe and resolve any conflicts in the testimony. The jury found that Nicholas opposed sexual harassment by

counseling and reprimanding Flores. We conclude Nicholas established she held a good faith belief that Flores may have engaged in sexual harassment and that her belief was objectively reasonable in light of the record presented. Chardavoyne testified Stenger-Castro said Spielhagen felt like she was being harassed and she would file a complaint if the lunch invitations did not stop. Although Stenger-Castro denied telling Chardavoyne and Nicholas that Spielhagen would file a formal complaint, he admitted he went to Chardavoyne out of an abundance of caution because an employee had said she did not want to be invited to lunch by a senior employee. And, although Stenger-Castro did not believe Flores's behavior violated SAWS's sexual harassment policy, he testified that based on his experience and years as general counsel he did not believe it was a good idea, "especially when somebody said they don't want to, for senior management to socialize with lower-level employees. I think it's risky . . . ." We therefore conclude the evidence is legally and factually sufficient to support the jury's finding that Nicholas engaged in a protected activity when she opposed sexual harassment by counseling and reprimanding Flores. On appeal, SAWS does not contest that Nicholas's discharge amounted to an adverse employment action. Therefore, we next consider whether the evidence is sufficient to support the jury's finding that SAWS retaliated against Nicholas because she engaged in a protected activity.

### RETALIATION

Nicholas argued SAWS retaliated against her by terminating her employment and by refusing to consider her or offer her employment for other positions with the company after her discharge.[1] At trial, Nicholas had to establish a "but for" causal nexus between her protected activity and SAWS's prohibited conduct. *McMillon*, 963 S.W.2d at 940. In relation to this element of her retaliation claim based on her discharge, the jury was instructed as follows:

---

[1] The jury found in Nicholas's favor on both claims, and she elected to recover under only her retaliatory discharge claim.

> Debra Nicholas must establish that without her counseling and reprimanding of Greg Flores in opposition to sexual harassment, if any, SAWS' termination of her employment would not have occurred when it did. There may be more than one cause for an employment decision. Debra Nicholas need not establish that her counseling and reprimanding of Greg Flores in opposition to sexual harassment, if any, was the sole cause of SAWS' termination of her employment.
>
> If you disbelieve the reasons SAWS has given for its decision, you may, but are not required to, infer SAWS terminated Debra Nicholas' employment because she opposed a discriminatory practice by counseling and reprimanding of Greg Flores for sexual harassment.
>
> If you find that Greg Flores made a recommendation, motivated by unlawful reasons, that he intended to cause an adverse employment action to Debra Nicholas, and SAWS discharged Debra Nicholas based on that recommendation, then you may, but are not required to, infer that SAWS discharged Debra Nicholas because of her opposition to a discriminatory practice by counseling and reprimanding Greg Flores for sexual harassment.

The jury found that SAWS discharged Nicholas because of her opposition to a discriminatory practice by counseling and reprimanding Greg Flores. On appeal, SAWS argues causation is conclusively negated by evidence of delay and there is no evidence from which the jury could reasonably infer causation. SAWS also asserts the jury's findings on retaliation are not supported by factually sufficient evidence.

SAWS first argues that the passage of three years from the date of the 2006 meeting with Flores to the date on which Nicholas was discharged conclusively negates causation and, therefore, it is entitled to reversal and rendition of a take-nothing judgment.

Neither Title VII nor the Human Rights Act state that retaliation must be immediate for it to be actionable. However, if the only circumstantial evidence of causation is temporal proximity between the protected activity and the alleged retaliatory action, then those events must be very close in time for that evidence to be sufficient for a jury to infer a retaliatory motivation. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (holding that action taken after twenty months "suggests, by itself, no causality at all"); *Azubuike v. Fiesta Mart, Inc.*, 970 S.W.2d 60,

65 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (holding two and one-half years, "with nothing more, is too long to establish that there was a causal connection"). "But it also is true that there is no hard-and-fast rule that any specified amount of time is too removed for an inference of causation. Especially where a defendant retaliates at the first opportunity that is presented, a plaintiff will not be foreclosed from making out a prima facie case despite a substantial gap in time." *Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 218 (D.D.C. 2008), *aff'd in part, rev'd in part on other grounds*, 601 F.3d 599 (D.C. Cir. 2010); *see Porter v. Calif. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005) (holding specified time period cannot be mechanically applied). Instead, consideration of the time between the protected activity and the retaliation "is part of our analysis, but not in itself conclusive of our determination of retaliation." *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992). The Third Circuit explained:

> It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

*Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3rd Cir. 1997).

Thus, we weigh the lapse of time as one of the elements in the entire calculation of whether Nicholas established a causal link between the protected activity and her subsequent discharge. When, as here, there is no direct evidence of causation; circumstantial evidence and the reasonable inferences drawn from that evidence may provide affirmative support for a finding of a causal link. *La Tier v. Compaq Computer Corp.*, 123 S.W.3d 557, 562 (Tex. App.—San Antonio 2003, no pet.); *Kachmar*, 109 F.3d at 177 (noting that although lack of temporal proximity may make it more difficult to show causation, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference."). In conducting our legal-sufficiency

review, we "must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *City of Keller*, 168 S.W.3d at 822. The term "inference" means,

> In the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved . . . .

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (citing BLACK'S LAW DICTIONARY 700 (5th ed.1979)). For a jury to infer a fact, "it must be able to deduce that fact as a logical consequence from other proven facts." *Id.* If the evidence only allows for one inference, neither jurors nor a reviewing court may disregard it. *City of Keller*, 168 S.W.3d at 822. Moreover, if the evidence at trial would enable reasonable minds to differ in their conclusions, a reviewing court must allow the jury to do so and not substitute its judgment, so long as the evidence falls within a zone of reasonable disagreement. *Id.*

We first address the time period relevant to establishing the causal link. SAWS relies on the almost three-year gap in time between the protected 2006 activity and Nicholas's discharge in 2009 to argue Flores could have engaged in retaliatory conduct immediately after the 2006 meeting because as vice president he had the ability to negatively impact Nicholas's work environment. However, the record does not support this contention. Chardavoyne stated Flores had no opportunity to reprimand or discipline Nicholas while he was CEO and she was his chief of staff. He agreed some of the board of directors did not like Nicholas; therefore, in April 2008, in an attempt to satisfy some of the board's concerns and improve communications between the CEO's office and the board, he suggested moving Nicholas to the position of vice president of support services. However, his reorganization suggestion was never implemented, and one month later,

he resigned as CEO. Chardavoyne stated he was concerned Nicholas would be targeted by some of the board members and lose her job. But, he agreed this had nothing to do with Flores.

Alternatively, SAWS argues that Flores clearly had the opportunity to retaliate in May 2008 when Nicholas was assigned to a position that reported directly to Flores. Nicholas counters that the probative time frame in which to judge the causal nexus is from February 2009 until Nicholas's discharge in May 2009 because this time period was the first opportunity Flores actually had to retaliate against her. We agree with SAWS that the relevant time period is the year during which Nicholas first came under Flores's direct supervision. *See Porter*, 419 F.3d at 895; *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554-55 (6th Cir. 2002); *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 752, n.4 (9th Cir. 2001). Therefore, we examine the record for the events that occurred during the one-year period from May 2008 through mid-2009 for evidence of a causal nexus between the protected activity and Nicholas's discharge.

In the spring of 2008, Chardavoyne resigned as CEO, and Robert Puente assumed the position of CEO. Puente decided he wanted his own chief of staff and, rather than terminate Nicholas's employment, he created an assistant vice president ("AVP") position for her that reported directly to Flores. She was the only AVP at SAWS from this date until her position was eliminated in 2009. Neither Flores nor Nicholas objected or expressed any concerns about her working for him.

However, according to Nicholas, Flores's antagonistic behavior toward her began immediately after she assumed the AVP position under his supervision. She testified Flores never came by her office, which was on the same floor as his, to welcome her; instead, he ignored her. When SAWS began its budget process, she was not told in advance of the meetings. Instead, Flores's administrative assistant would call her and ask "Where are you? . . . Greg [Flores] wants you in this meeting." Nicholas said this happened numerous times and she spoke to Flores about

the problem. Flores said he would speak with his assistant and have her put the meetings on Nicholas's calendar. Because this never happened, Nicholas resorted to meeting with the assistant to align the calendars. After resolving the problem with Flores's assistant, Nicholas attended all the meetings.

Nicholas said she believed she was on the Executive Management Team because she received emails announcing the meetings. However, shortly after becoming AVP under Flores, he told her not to attend the meetings. Nicholas admitted the decision that she would not attend the EMT meetings was Puente's, Flores had no authority to determine who attended the EMT meetings, and her 2006 counseling of Flores had nothing to do with Puente not wanting an assistant vice president attending the meetings. She also admitted she never complained to anyone about not being allowed to attend the meetings.

Nicholas also testified about two instances where she thought Flores had "set her up" to appear unprepared. One instance involved her and other SAWS staff working on a survey with a consultant on a water supply plan that entailed polling the community on various issues. Nicholas said she briefed Flores of the status of the survey and he reviewed the survey questions. She had no contact with Puente on the project; Flores told her he communicated with Puente about the project. When it came time to present the information to Puente, she and Flores went into the meeting with Puente, his chief of staff, and another vice president. Flores asked Nicholas to make the presentation, but after she began speaking, Puente turned to his chief of staff and asked if she knew "that this was going on." When his chief of staff said she did not know, Puente got upset and said he did not know either and he left the meeting.

The second instance involved a meeting to discuss the "Outreach" plan for water resources. Nicholas asked Flores if there was anything she needed to prepare for or that she needed to take to the meeting and he told her "no." She said many people were in the meeting, including Puente

and the senior vice president of water resources. Nicholas said "it quickly became apparent that I was the center of attention because all the questions related to how we were going to do the Outreach plan on water resources . . . ." She said she was angry because Flores did not tell her they were supposed to make a presentation.

Nicholas also said the first time she thought she might need to protect herself from Flores was during a budget meeting that occurred in August 2008, two months after she was placed under his supervision. She said she and Flores had been invited to the two-day meeting by the director of budget and rates. She had prepared the budget for the communications/external relations departments and Flores was unfamiliar with the budget. On the first day of the meeting, many people attended and Nicholas had no role that day. On the second day, the communications/external relations budget was to be presented. After Nicholas presented the budget, she received a text message from Flores "telling [her] that [she] probably had better things to do." She stated she did not know it was Puente's decision that she leave the meeting. The day after the meeting, she met with Flores about her AVP job objectives and to ask him if it was "Robert or Alex's" decision that she leave the budget meeting. She did not ask if it was Flores's decision and she stated she was not upset with Flores at the time. She admitted "this situation" had nothing to do with her 2006 counseling of Flores.

Flores did not initially give Nicholas any job objectives, but she admitted the lack of objectives did not harm her because she set her own and she already knew what to do with regard to running the communications department. She described her performance evaluations as "neutral." In November 2008, about five months after Nicholas assumed the AVP position, Flores sent an email stating he would rely heavily on Nicholas to lead the communications department because he would be concentrating his leadership efforts on external relations. Nicholas said she believed she was already running the department even before the email.

Stenger-Castro testified he was involved in some of the discussions that led up to Nicholas's termination and the issue of Flores asking Spielhagen to lunch did not come up in these discussions. In fact, he believed Flores and Nicholas were very good friends, and Flores gave Nicholas a favorable performance evaluation in April 2009. He also believed Flores did not want to terminate Nicholas, and that decision was made by Puente. Stenger-Castro opined that two things were happening leading up to the elimination of Nicholas's position. First, she was laid off because of the reorganization. Second, Puente did not trust Nicholas in the AVP position with the public, he believed her judgment was flawed, and she might undermine him publicly. Although Flores never gave him the impression he wanted to terminate Nicholas, Stenger-Castro said that in an early 2009 meeting, Puente questioned Flores about whether Nicholas's position was necessary.

Flores testified he did not object when told of the assignment of Nicholas as AVP under his supervision. Flores said Puente decided Nicholas would no longer be on the EMT after the reassignment. He admitted it was his job to create job objectives for Nicholas, but he did not do so until April 2009, almost one year after her reassignment and one month before her termination.

Regarding the company reorganization, Flores testified that in June 2008, one AVP and three directors worked under him. In September 2008, Puente appointed another vice president to run customer service, and this person reported to Flores. The appointment of a vice president to oversee customer service left more time for Flores to spend on the day-to-day operations of the communications/external relations department. On November 3, 2008, Flores sent an email stating that although he remained responsible for both customer service and communications/external relations, he would begin concentrating his leadership efforts on external relations and rely heavily on Nicholas to lead communications. The customer service department was later reassigned to report directly to Puente.

In the spring of 2009, Puente asked Flores to examine how the communications/external relations department could be reorganized to improve efficiency and save money. Flores said he decided he had too many management positions in the communications department versus non-management positions and some duties were duplicated. For example, the customer service department had nine management positions for over 200 non-management employees, while the communications department had seven management positions for only seventeen non-management employees. Based on these numbers, Flores decided the communications department was "top-heavy." From about March 2009 through May 2009, Flores created three reorganization proposals, the first two of which did not explicitly recommend eliminating the AVP position but each of which did not show an AVP position. Flores explained he proposed to align the communications and external relations workgroups under a single director, which resulted in the elimination of the AVP position over the communications workgroup. In April 2009, Flores gave Nicholas an evaluation showing her to be a productive employee. The third reorganization proposal, dated May 11, 2009, for the first time expressly stated the elimination of the AVP position. This proposal, which was eventually implemented, showed five management positions all reporting to Flores. Flores said this final structure of the communications department was similar to the structure he proposed, and of which Nicholas was aware when she was chief of staff, when he first started working at SAWS.

Flores said he made the recommendation regarding the AVP position, but Puente made the ultimate decision. He stated his recommendation had nothing to do with any alleged counseling or reprimand. On May 11, 2009, Flores told Nicholas her position had been eliminated. On May 22, 2009, the reorganization was announced. No one else at SAWS lost their job as part of the reorganization.

On May 11, 2009, when Flores told Nicholas that her position had been eliminated, she asked him how he could do this to her after she had "supported him in the sexual harassment." She explained she meant that "[h]ad [she] not believed Greg Flores when he said that he would quit asking Lisa Spielhagen and Sharon Snoga out to lunch, and David Chardavoyne and I talked about that, there would have been a different outcome[, an investigation]." Flores, on the other hand, said he did not know what she was referring to when she asked "how can you do this to me when I stood up for you regarding the allegations of sexual harassment?" He said he was "puzzled" and "curious." But, he did not ask her what she meant.

On May 14, 2009, Nicholas sent a letter to Flores stating she wanted a position at SAWS and stating she believed he was retaliating against her because she counseled him about asking Spielhagen and Snoga to lunch. Nicholas said she knew SAWS had hired Cynthia Cano to conduct an investigation of her retaliation claim, but she was unable to meet with her because her mother had died. She said Jerry Bailey, vice president of human resources, told her that regardless of the outcome of the investigation, she would not be rehired by SAWS.

Robert Puente testified he became SAWS's CEO in May 2008 and shortly thereafter he began the first of several reorganizations of SAWS departments. He said he made the decision to reassign Nicholas to the communications department as an AVP in May 2008 because he wanted his own chief of staff and he knew the board of directors thought she was difficult to work with, she did not show the board enough deference, and she was too loyal to Chardavoyne. He said Flores had some input into the reassignment decision and it was up to Flores to give him recommendations about how to improve his department, but Flores could not approve or disapprove the reassignment. Puente said Nicholas took the reassignment very well. Before creating the AVP position for Nicholas, Puente considered other positions, but he could not find another position that took advantage of her skills. He also considered laying her off or terminating

her employment but she had not done anything to justify being fired. On May 23, 2008, Puente issued an organizational announcement that included an announcement that Nicholas would be an AVP in communications under Flores. At this time, he had no doubts about Nicholas's competence to act in this capacity. On June 5, 2008, an email from Puente's administrative assistant was sent to Nicholas and others about an EMT meeting. However, the next day Flores emailed Nicholas stating, "Debra, only I am required to represent our group at EMT." According to Puente, Nicholas's transition from chief of staff to AVP effectively removed her from the EMT because the only members of the EMT were himself, his chief of staff, and other vice presidents, and he did not invite Nicholas to the EMT meetings. Puente said Nicholas's name should not have been on his administrative assistant's email, and in fact, another woman who no longer worked at SAWS was also mistakenly on the list of people to attend the meeting. He said the list of people in his email came from a list of Chardavoyne's that had never been updated.

Puente also stated he told Flores that Nicholas should not attend the budget meeting. Puente explained that at the beginning of the budget process, many people are involved, but as the decisions are narrowed fewer people were involved. Toward the end of the budget process, at a meeting of only the EMT members, he noticed Nicholas was present. Puente said he asked Flores to tell Nicholas that she should excuse herself from the meeting. Puente stated Flores did not influence this decision. As to the meeting about the water survey, Puente admitted he was upset, but he said he was mostly frustrated with his own chief of staff because the people at the meeting did not appear prepared to present the issue to him for a decision. He never felt Nicholas was unprepared, he thought she always did a good job, and he never saw anything to make him believe Flores was setting her up.

Puente testified that during the time Nicholas worked for Flores, Flores never said he thought the reassignment would not work or gave any indication he could not work with Nicholas.

Flores never told Puente he was unsatisfied with Nicholas's work. When Puente was asked if Flores could have laid Nicholas off without his approval, Puente responded: "I don't think he could have, no. Well, if he had, he would have had to seek my input or my understanding of that."

Puente stated another reorganization occurred in 2009 and he relied on the recommendations of his department heads, vice presidents, and others. He explained that 2008 and 2009 were difficult financial years for San Antonio, SAWS had just gotten a rate increase from City Council and was facing another; therefore, he believed SAWS needed to do as much cost cutting as possible. A number of positions were vacant and Puente told his vice presidents they could not fill the positions and to examine their departments and make recommendations regarding a restructure.

On March 23, 2009, Flores gave Puente his proposal for reorganizing his department to include only four leadership positions: three managers and one director. An AVP was not included. Puente did not accept this proposal. On May 8, 2009, Puente held a meeting in his office with Flores, Crow, and Bailey to finalize the reorganization announcement and decide who would be affected by the reorganization. Puente said he made the decision that Nicholas's AVP position would be eliminated. An email from Flores to Puente indicated the organizational chart that was ultimately accepted and again showed the elimination of the AVP position and the downward reclassification of the director of communications position held by Billy Peche to a manager position. Puente also said that at the same time the 200-plus-employees customer service department was moved from under Flores to report directly to Puente. This decision left less than thirty people under Flores, which resulted in Flores's department being top-heavy. Because Flores no longer had responsibility for the customer service department, he was now free to be "more hands on" with the communications department. At the time Puente did not know about the 2006 meeting at which Flores had been counseled/reprimanded. At the end of the May 8 meeting,

Puente told Flores and the human resources department to inform Nicholas that her position had been eliminated. Because she was not in the office, she was informed on May 11. Approximately two days later, Flores again asked Spielhagen to lunch.

Puente admitted he relied on Flores's recommendations with regard to the communications department. Puente insisted Nicholas was not fired; instead, her "position was eliminated" because the AVP position was no longer needed. Other than her position being eliminated, he knew of no other reason Nicholas no longer worked at SAWS. Puente explained that during the same reorganization in which Nicholas's position was eliminated, other already vacant positions were also eliminated. Puente explained that although these positions were vacant, their elimination resulted in a "cost-avoidance" savings for SAWS because SAWS collected rates based on all positions at the company, even vacant ones.

Viewing all of the evidence in the light most favorable to the verdict and indulging every reasonable inference in favor of the verdict, as we are required to do, we conclude that the evidence of causation, including circumstantial evidence, amounts to more than a mere scintilla. *See City of Keller*, 168 S.W.3d at 822. There is some evidence from which reasonable jurors could draw a reasonable and logical inference that Flores recommended the elimination of Nicholas's position because she had counseled/reprimanded him for sexual harassment. The jury was entitled to resolve inconsistencies and conflicts in the evidence, and we must accept the jury's resolution of these inconsistencies and conflicts. *Id.* at 819-20. In doing so, the jury could have disregarded Puente's testimony that he was not influenced by Flores when the decision was made to eliminate Nicholas's position. And, the jury heard evidence that Nicholas was the only SAWS employee to have her employment terminated during a company-wide reorganization. Because the evidence rises to a level that would enable reasonable and fair minded people to differ in their conclusions, we conclude the evidence is legally sufficient to support the jury's verdict on causation. *Id.* at 822.

Also, viewing all the evidence in a neutral light, we conclude that it is factually sufficient to support the jury's finding on the issue of causation, and that the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176.[2]

## DAMAGES CAP

The jury was asked, in two separate questions, what sum of money, if any, would compensate Nicholas for her damages relating to her two retaliation claims. Each question set forth three types of damages: back pay, compensatory damages in the past, and compensatory damages in the future. For each question, compensatory damages in the future was defined as including future wages and benefits; and emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life. Each question on future compensatory damages contained two sub-parts asking the jury for an amount: one sub-part asked the jury for an amount related to "[w]ages and benefits that [Nicholas] would have earned in the future" and the second sub-part asked the jury for an amount related to "[e]motional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life that [Nicholas] will likely suffer in the future."

On her retaliatory discharge claim, the jury awarded Nicholas future compensatory damages in the amounts of $759,007.00 for future wages and benefits, and $25,000.00 for emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life. In its final issue, SAWS asserts the trial court erred by refusing to apply the Texas statutory cap of $300,000.00 on future compensatory damages to each claim.

---

[2] Because we conclude the evidence is sufficient to establish causation on Nicholas's retaliatory discharge claim, we do not address SAWS's other issues on appeal related to the sufficiency of the evidence in support of Nicholas's claim that SAWS retaliated against her by refusing to consider her or offer her employment for other positions with the company after her discharge.

On finding that a defendant "engaged in an unlawful intentional employment practice as alleged in a complaint, a court may, as provided by this section, award: (1) compensatory damages; and (2) punitive damages." TEX. LAB. CODE § 21.2585(a). "Compensatory damages awarded under this section may not include: (1) back pay; (2) interest on back pay; or (3) other relief authorized under Section 21.258(b)." *Id.* § 21.2585(c). "The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and the amount of punitive damages awarded under this section may not exceed, for each complainant . . . $300,000 in the case of a [defendant such as SAWS] that has more than 500 employees." *Id.* § 21.2585(d)(4). SAWS asserts Nicholas included her claim for future wages and benefits ("front pay") in "compensatory damages" and the award for each claim impermissibly exceeds $300,000.00. Therefore, SAWS argues the trial court erred in denying its request to apply the cap.

On appeal, Nicholas argues the statutory cap does not apply because "front pay" is an equitable remedy intended to make a person whole after suffering employment discrimination when reinstatement is not feasible. Nicholas relies on the U.S. Supreme Court's opinion in *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001), in which the Court considered whether front pay was an element of compensatory damages under 42 U.S.C. § 1981a and, thus, subject to the statutory damages cap imposed by that section.

In *Pollard*, the Supreme Court explained that

> [f]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement. . . . In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of the discrimination, courts have ordered front pay as a substitute for reinstatement.

*Id.* at 846.

The Court "recognized that reinstatement [is] not always a viable option, and that an award of front pay as a substitute for reinstatement in such cases [is] a necessary part of the 'make whole' relief mandated" in employment discrimination legislation and by the Supreme Court. *Id.* at 850; *see also Wal–Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 45 (Tex. App.—Austin 1998, pet. denied) (affirming award of front pay under Human Rights Act). Thus, front pay is awarded to compensate the plaintiff for future lost wages and benefits. *See Hansard v. Pepsi–Cola Metro. Bottling Co., Inc.*, 865 F.2d 1461, 1469 (5th Cir.1989) (stating that "'[f]ront pay' refers to future lost earnings").

In *Pollard*, an employee brought a sexual-harassment claim against her employer under Title VII of the Civil Rights Act of 1964. The district court denied the employee's request for front pay. In determining whether the employee was entitled to an award of front pay, the Supreme Court addressed section 706(g) of the Civil Rights Act (as originally enacted),[3] which authorized courts to "enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1); *Pollard*, 532 U.S. at 847-48. The Court confirmed the availability of front pay as an equitable remedy under the Civil Rights Act. *Pollard*, 532 U.S. at 853-54.

In affirming the availability of front pay awards in lieu of reinstatement, the Court explained:

> We see no logical difference between front pay awards made when there eventually is reinstatement and those made when there is not. Moreover, to distinguish between the two cases would lead to the strange result that employees could receive front pay when reinstatement eventually is available but not when reinstatement is not an option—whether because of continuing hostility between the plaintiff and the employer or its workers, or because of the psychological injuries that the

---

[3] Section 706 of the Civil Rights Act may now be found at 42 U.S.C. § 2000e-5.

discrimination has caused the plaintiff.  Thus, the most egregious offenders could be subject to the least sanctions.

*Id.* at 853.

The Court noted that, in 1991, Congress expanded the remedies available in intentional employment discrimination cases by including compensatory and punitive damages, but limited the recovery of such damages by enacting various statutory damage caps.  *Id.* at 851.  The cap in the Civil Rights Act states:

> The sum of the amount of compensatory damages awarded under this section for *future pecuniary losses*, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party [a cap amount depending on number of employees].

42 U.S.C. § 1981a(b)(3) (emphasis added).

In considering whether an award for front pay fell within the statutory cap in the Civil Rights Act, the Supreme Court stated that, "[i]n the abstract, front pay could be considered compensation for 'future pecuniary losses,'" subject to the statutory cap on compensatory damages.  *Pollard*, 532 U.S. at 852.  However, the Court concluded that, in reading section 1981a as a whole, "the better interpretation is that front pay is not within the meaning of compensatory damages" and is excluded from the statutory cap.  *Id.*  Thus, the Supreme Court held that awards for front pay in lieu of reinstatement did not fall within the statutory cap on compensatory damages set forth in section 1981a.  *Id.* at 852-53.

Few Texas courts have considered whether front pay falls within the meaning of "compensatory damages" as set forth in the Texas Human Rights Act.  In *Hoffman-La Roche, Inc. v. Zeltwanger*, the Corpus Christi Court of Appeals, relying on *Pollard*, held that an award for front pay in lieu of reinstatement was not subject to the statutory cap on compensatory damages under Labor Code section 21.2585(d).  69 S.W.3d 634, 653 (Tex. App.—Corpus Christi 2002),

*rev'd on other grounds*, 144 S.W.3d 438 (Tex. 2004); *see also Tex. Comm'n on Human Rights v. Morrison*, 346 S.W.3d 838, 850 n.17 (Tex. App.—Austin 2011) (stating in footnote, "Equitable relief, such as back pay and front pay, is not subject to the cap [under Texas Labor section 21.2585(d)]."), *rev'd on other grounds,* 381 S.W.3d 533 (Tex. 2012). One Texas court has considered the issue under the Whistleblower Act, and held, relying on *Pollard*, that an award for front pay in lieu of reinstatement was not subject to the statutory cap on compensatory damages under the Texas Whistleblower Act. *City of Houston v. Levingston*, 221 S.W.3d 204, 234 (Tex. App.—Houston [1st Dist.] 2006, no pet.).[4] On appeal, SAWS argues these Texas opinions merely relied on *Pollard* without comparing the language of Labor Code section 21.2585 with the language of 42 U.S.C. § 1981a.

The Human Rights Act prohibits an employer from discriminating against an individual because of race, color, disability, religion, sex, national origin, or age. *See* TEX. LAB. CODE § 21.051. "The [Human Rights Act] 'is modeled after federal law with the purpose of executing the policies set forth in Title VII of the federal Civil Rights Act of 1964.'" *Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004) (quoting *Green v. Indus. Specialty Contractors, Inc.*, 1 S.W.3d 126, 131 (Tex. App.—Houston [1st Dist.] 1999, no pet.)); *see also* TEX. LAB. CODE § 21.001. "As such, federal case law may be cited as authority in cases relating to the Texas Act." *Zeltwanger*, 144 S.W.3d at 446. "In creating causes of action for discrimination . . . both Congress and the Texas Legislature have specified the types and amounts of damages that may be awarded." *Id.*; *see also* 42 U.S.C. § 1981a(b); TEX. LAB. CODE § 21.2585. Under both section 1981a and the

---

[4] "In a suit under [the Whistleblower Act] against an employing state or local governmental entity, a public employee may not recover compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses in an amount that exceeds [the cap]." TEX. GOV'T CODE ANN. § 554.003(c) (West 2012).

Human Rights Act, a court may award compensatory damages upon finding that an employer has engaged in an unlawful intentional employment practice and may further award punitive damages when the discriminatory practice is with malice or reckless indifference. 42 U.S.C. § 1981a(a)(1),(b)(1); TEX. LAB. CODE § 21.2585(a),(b).

Both section 1981a and the Human Rights Act cap awards of punitive and compensatory damages on a sliding scale commensurate with the size of the employer. 42 U.S.C. § 1981a(b)(3); TEX. LAB. CODE § 21.2585(d). The largest employers, like SAWS, are subject to a maximum cap of $300,000. 42 U.S.C. § 1981a(b)(3)(D); TEX. LAB. CODE § 21.2585(d)(4). The compensatory damages that are capped under section 1981a specifically include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses . . . ." 42 U.S.C. § 1981a(b)(3). The compensatory damages that are capped under the Human Rights Act specifically include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." TEX. LAB. CODE § 21.2585(d). Under both statutes, the cap does not apply to back pay, interest on back pay, and equitable relief. 42 U.S.C. § 1981a(b)(2); TEX. LAB. CODE § 21.2585(c)(3).

On appeal, SAWS argues the relief available under Title VII, and more specifically 42 U.S.C. § 2000e-5(g), is much broader than the "other relief authorized under Section 21.258(b)" of the Human Rights Act. Under the federal statute examined by the *Pollard* Court, if a court finds that an employer has

> intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action *as may be appropriate*, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the

unlawful employment practice), or *any other equitable relief as the court deems appropriate*. . . . .

42 U.S.C. § 2000e-5(g)(1) (emphasis added).

SAWS argues that in contrast to the broad language emphasized above, the Human Rights Act specifically states what "additional equitable relief" is appropriate in section 21.258:

Additional equitable relief may include:

(1) hiring or reinstating with or without back pay;
(2) upgrading an employee with or without pay;
(3) admitting to or restoring union membership;
(4) admitting to or participating in a guidance program, apprenticeship, or on-the-job training or other training or retraining program, using objective job-related criteria in admitting an individual to a program;
(5) reporting on the manner of compliance with the terms of a final order issued under this chapter; and
(6) paying court costs.

TEX. LAB. CODE § 21.258(b).

SAWS concludes that, other than back pay and interest on back pay, only relief authorized by section 21.258(b) is excluded from the statutory cap contained in section 21.2858(d). We do not agree that only the above six forms of relief are available as "additional equitable relief." Section 21.258(b) does not state "additional equitable relief" is limited *only* to the six listed types of relief. Instead, the section states that "[a]dditional equitable relief *may* include" the six listed types of relief.

Whenever possible, statutes should be given their everyday, reasonable meaning. Use of the term "may" in statutes is usually construed as directory or permissive. *Valles v. Tex. Comm'n on Jail Standards*, 845 S.W.2d 284, 288 (Tex. App.—Austin 1992, writ denied). Generally, "may" is given a permissive construction, and "shall" is given a mandatory construction. *Inwood North Homeowners' Ass'n v. Meier*, 625 S.W.2d 742, 744 (Tex. Civ. App.—Houston [1st Dist.] 1981, no writ); *see also Helena Chem. Co. v. Wilkins*, 47 S.W.3d 483, 493 (Tex. 2001) ("While Texas

courts have not interpreted 'must' as often as 'shall,' both terms are generally recognized as mandatory, creating a duty or obligation."); TEX. GOV'T CODE ANN. § 311.016(1), (2), (3) (West 2013) ("(1) 'May' creates discretionary authority or grants permission or a power. (2) 'Shall' imposes a duty. (3) 'Must' creates or recognizes a condition precedent."). "In determining whether the Legislature intended the particular provision to be mandatory or merely directory, consideration should be given to the entire act, its nature and objectives, and the consequences that would follow from each construction." *Chisholm v. Bewley Mills*, 155 Tex. 400, 287 S.W.2d 943, 945 (1956); *Planet Ins. Co. v. Serrano*, 936 S.W.2d 35, 36-37 (Tex. App.—San Antonio 1996, no writ) (quoting *Chisholm*); *Meier*, 625 S.W.2d. at 743 (same).

"The [Human Rights Act] was enacted to address the specific evil of discrimination and retaliation in the workplace." *City of Waco*, 259 S.W.3d at 153; *see* TEX. LAB. CODE § 21.001. "By enacting the [Human Rights Act], the Legislature created a comprehensive remedial scheme that grants extensive protections to employees in Texas, implements a comprehensive administrative regime, and affords carefully constructed remedies." *City of Waco*, 259 S.W.3d at 153-54. The Human Rights Act's general purposes include "provid[ing] for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments (42 U.S.C. Section 2000e et seq.)" and "secur[ing] for persons in this state, including persons with disabilities, freedom from discrimination in certain employment transactions, in order to protect their personal dignity." TEX. LAB. CODE § 21.001(1), (4). "The [Human Rights Act] plainly proscribes retaliation for having opposed conduct made unlawful by the [Human Rights Act], irrespective of the merits of the underlying discrimination claim." *City of Waco*, 259 S.W.3d at 151; *Cook*, 974 S.W.2d at 224 (same).

An essential purpose of both the federal and Texas statutes is to make persons "whole" who have suffered injuries as a result of an unlawful employment practice. Making a claimant

"whole" includes an award for back pay and front pay when reinstatement is not feasible. Back pay is not included within the scope of the compensatory damages cap because back pay is considered equitable relief. *See* TEX. LAB. CODE § 21.2585(c)(1). Although neither statute literally mentions the term "front pay," both the federal and Texas statutes allow the court to order appropriate equitable relief. Because front pay is an alternative to reinstatement, we believe it is equitable in nature. *See* TEX. LAB. CODE § 21.258(b)(1) (additional equitable relief may include reinstatement with or without back pay); *see also Cook*, 974 S.W.2d at 227 ("Under the [Human Rights Act], front pay is available as equitable relief in lieu of reinstatement."); *Tex. Youth Comm'n v. Koustoubardis*, 378 S.W.3d 497, 502 (Tex. App.—Dallas 2012, no pet.) ("Front pay is an equitable remedy intended to compensate a plaintiff for future lost wages and benefits."); *City of Austin v. Gifford*, 824 S.W.2d 735, 744 (Tex. App.—Austin 1992, no writ) (holding, "a trial court's award of front pay constitutes a legitimate exercise of its equity powers"). We also note that if the Legislature had intended to limit "additional equitable relief" to only the six types of relief listed in section 21.258(b), it could have done so with more restrictive language. Therefore, we conclude that the use of the word "may" in section 21.258(b) is discretionary. Accordingly, because front pay is a form of equitable relief, it is not limited by the statutory cap on compensatory damages.

SAWS also argues that treating back pay differently from front pay harmonizes sections 21.258 and 21.2585. Under section 21.258, "[l]iability under a back pay award may not accrue for a date more than two years before the date a complaint is filed with the commission." TEX. LAB. CODE § 21.258(c). According to SAWS, a similar limit on front pay is unnecessary because front pay is limited under the cap contained in section 21.2585. We disagree with this argument.

An employment discrimination claim must be filed with the appropriate governmental agency "not later than the 180th day after the date the alleged unlawful employment practice occurred." *Id.* § 21.202(a). A civil action for employment discrimination under the Human Rights

Act "may not be brought . . . later than the second anniversary of the date the complaint relating to the action is filed." *Id.* § 21.256. Short limitations periods "limit the employer's uncertainty about the composition of his work force and his exposure to claims for back pay, which would continue to mount up until the judgment if the plaintiff could not find an equivalent job; and to facilitate reinstatement." *Knutson v. UGS Corp.*, 526 F.3d 339, 341 (7th Cir. 2008); *see also Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 80-81 (7th Cir. 1992) ("The short statutes of limitations in employment cases have a purpose—both back pay obligations and the difficulty of reintegrating a terminated worker into the workforce grow with each day that passes before an employment dispute is resolved—and it is ill served when the employer does not receive prompt notice of the dispute."). A two-year limitation on an award of back pay is consistent with these policy considerations. No such concerns, however, are present with an award of front pay.

## CONCLUSION

For the reasons stated above, we conclude the evidence is sufficient to support the jury's verdict on Nicholas's retaliatory discharge claim, and that the $300,000.00 compensatory damages cap does not apply to an award of front pay. Therefore, we overrule SAWS's issues on appeal and affirm the trial court's judgment.

Sandee Bryan Marion, Justice